**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Modulus Global Incorporated,<br><br>           Plaintiff,<br><br>v.<br><br>Patrick Gruhn, et al.,<br><br>           Defendants. | No. CV-24-03195-PHX-ROS<br><br>**ORDER** |

Before the Court are several Motions to Dismiss for lack of personal jurisdiction (Docs. 48, 51, 52, 53, 54, 55). The Plaintiff responded to each (Docs. 66, 67) and the Defendants replied. (Docs. 70, 72, 73, 74, 75). For the reasons stated, the Court will grant the Motions to Dismiss as to Defendants Brandon Williams ("Williams"), Kephas Corporation, WIB Technologies Inc., and DAAG USA, LLC, and deny the Motion to Dismiss as to Defendants Patrick Gruhn ("Gruhn"), and Stephen Stephens.

**I.  Background**

Although Plaintiff alleges tort claims, this case arises from two contracts entered between Plaintiff Modulus Global, Inc. ("Modulus") and Digital Assets AG ("DAAG").[1] Modulus is a corporation incorporated in Delaware that "provides advanced, proprietary financial technology products and services." (Doc. 39 ¶¶ 3, 7). In August 2021, Modulus entered into two Licensing Agreements with DAAG for use of Modulus' matching engine

---

[1] It is noted "DAAG" is not alleged to be a defendant in this case, rather "DAAG USA" is an alleged defendant and "DAAG" is a party to the two contracts.

and source code. (Doc. 39 ¶ 4). Modulus alleges DAAG and the Defendants, through the Licensing Agreements, secretly worked to provide financial company FTX Trading Ltd. ("FTX") and others with prohibited access to Modulus' engine and source code.[2] What follows are the alleged facts.

Defendants Gruhn, Williams, and Stephens[3] were aware of Modulus' software from at least July 18, 2018 (Doc 39 ¶¶ 57–58). Having a pre-existing relationship with then-CEO of FTX Samuel Bankman-Fried, in May 2020, Defendant Williams proposed a deal with FTX to help FTX expand into the European Union. (Doc. 39 ¶ 65). Both Williams and Gruhn incorporated DAAG in July 2020 and entered into two confidential Share Purchase Agreements (the "First SPA" and "Second SPA") in October 2020 and July 2021, whereby FTX's associated entity Alameda acquired 20% of DAAG shares in advance of DAAG having begun operating. (Doc. 39 ¶¶ 66–74). The acquisition price in the Second SPA reflected a $370 million valuation of DAAG, which was unusual because at the time DAAG had no active business. (Doc. 39 ¶¶ 74–77).

Just a month after receiving payment under the Second SPA, Gruhn contacted Modulus via an online contact form expressing interest in Modulus' Source Code. (Doc. 39 ¶ 78-80). Modulus then began a "careful vetting process" and negotiations with Gruhn and Stephens for the software licenses. (Doc. 39 ¶ 84). Throughout the process, Gruhn and Stephens failed to disclose the close relationship between DAAG and FTX despite the "careful vetting process" and the confidentiality conditions contained in the "License Agreements" (Source Code). (Doc. 39 ¶¶ 82–86). Had Modulus known of this relationship, it would not have agreed to license its Source Code to DAAG. (Doc. 39 ¶ 102).

---

[2] Hereafter the "source code" will be referred to as: Source Code.
[3] **Gruhn** is identified as a founder, shareholder, and Global IT Director of DAAG (Doc. 39 ¶ 56), as well as President and owner of Kephas Corp. (Doc. 39 ¶ 26), and "owner/member" of DAAG USA (Doc. 51 at 14) and primary owner and CTO of WIB Technologies. (Doc. 39 ¶ 28). Although Gruhn's title at DAAG is undefined, he had authority to sign contracts on DAAG's behalf. *See* Doc. 66-2. **Williams** is identified as a co-founder, shareholder, and Corporate Development Lead of DAAG. (Docs. 39 ¶ 25; 34-4 at 2). These titles are undefined. **Stephens** is identified as the CEO of WIB Technologies and COO of Kephas Corp. (Doc. 39 ¶ 24, 28). His official role with DAAG is not specified.

One day prior to execution of the License Agreements, Stephens introduced Shailesh Nair to Modulus as the project lead for DAAG's implementation of the licensed Source Code. (Doc. 39 ¶ 93). Nair also had connections with FTX: days before his introduction as the project lead, he opened a personal forked repository in the Go FTX Library on GitHub—a platform for storing and sharing code and files such as the licensed Source Code. (Doc. 39 ¶¶ 87–90, Doc. 39-5 at 3). The Go FTX Library is used by programmers and users to interact with FTX's exchange. (Doc. 39 ¶ 93).

On August 20, 2021, Modulus, still completely unaware of DAAG's involvement with FTX insiders, executed the License Agreements with DAAG. (*Id.*) The License Agreements included certain essential and key provisions and restrictions, including non-transferability, confidentiality, usage restrictions, technical support and updates, and Arizona choice-of-law and arbitration provisions. (Docs. 44, 44-1).

The Licensed Source Code was deployed to DAAG in mid-October, and by the end of the month, FTX was in the process of finalizing the purchase of the remaining 80% of DAAG's shares. (Doc. 39 ¶ 14-15). Counsel for FTX notably found a due diligence process unnecessary because "they do not have any active business," "they are not yet operating," and FTX was "not too concerned" because DAAG was "not up and running yet." (Doc. 39 ¶ 115, Doc. 39-1 ¶ 73-76). Examining DAAG's financial statements was also "not important for the business going forward." (*Id.*).

The Third Share Purchase Agreement ("Third SPA") was finalized on November 14th, 2021, and the 20% previously acquired by Alameda was transferred to FTX in a separate share purchase agreement just days later. (Doc. 39-1 ¶¶ 63, 70). After the Third SPA, Defendant Williams parted ways with DAAG and DAAG began to operate as FTX Europe, with Gruhn serving as its head. (Doc. 39 ¶ 138, 192).

After this acquisition, Modulus alleges Defendants provided FTX with the Licensed Source Code in violation of the License Agreements and trade secrets law. Historically, FTX's matching engine and software were notoriously flawed. (Doc. 39 ¶ 4). But approximately one year after DAAG received the Source Code, in October 2022, Samuel

Bankman-Fried posted a series of tweets (the "Matching Engine tweets") touting upcoming improvements to its matching engine. (Doc. 39 ¶¶ 16–17). The tweets indicated these improvements had "been in the works for most of the year." (*Id.*). Seven days before FTX's planned release of these improvements, Stephens sent an email to Modulus' CEO Richard Gardner asking for an updated version of the Licensed Source Code, requesting: ""We would like to get together soon to go through a technical call about Modulus. Does our license give us access to the latest version of the Modulus system? Can we do that this week?" (Doc. 39 ¶ 176). The acquisition was finally disclosed when Stephens included FTX employees in an emailed meeting invitation regarding the updated Source Code. (Doc. 39 ¶¶ 180–86). Other related entities including Defendants Kephas Corp. and WIB Technologies[4] also now provide products containing Source Code identical to Modulus' Source Code. (Doc. 39 ¶¶ 199–207, 218–19).

Furthermore, in February 2022 an accounting and professional services firm called BDO USA, LLP was retained by Jen Chan, Chief of Staff for the FTX Group, to "determine the fair value of the [assets and liabilities] of DAAG, acquired by FTX Trading Ltd. on November 14, 2021." (Doc. 39-7 at A.0147). This report found "the primary rationale behind the acquisition of DAAG was to acquire its operating licenses." (*Id.* at A.0149). The list of relevant operating licenses included, notably, "Modulus, Matching engine, Crypto Derivative Exchange." (*Id*. at A.0150).

Modulus argues these facts and timeline are highly suggestive of the Defendants' intent to misappropriate Modulus' Source Code through the License, establishing an inference of culpability. *See Soo Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017). It is on this factual record that the Court bases its decisions on the Motions to Dismiss. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir.2004) ("[U]ncontroverted allegations in the complaint must be taken as true.").

**II.   Legal Standard**

---

[4]WIB Technologies serves as an IT provider for DAAG and Kephas Corp. Kephas Corp. served as an IT provider for FTX Europe.

The Arizona and federal rules governing personal jurisdiction are identical, as Arizona's long arm statute "provides for personal jurisdiction co-extensive with the limits of federal due process." *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1050 (9th Cir.1997) (citing *Batton v. Tenn. Farmers Mut. Ins. Co.*, 736 P.2d 2, 4 (Ariz. 1987)); *see also* Ariz. R. Civ. P. 4.2(a). "By requiring that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign,' the Due Process Clause 'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir.1995) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal citations omitted)).

If a defendant has not had substantial or continuous and systematic contacts with the forum state, the court must determine whether the defendant has had sufficient contacts with the forum state such that the exercise of specific jurisdiction over the defendant would not offend the Due Process Clause. *See Int'l Shoe Co. v. Washinton*, 326 U.S. 310, 316 (1945). To determine whether a defendant has sufficient minimum contacts with a forum state, courts must focus on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977). Courts use a three-part test to analyze whether specific jurisdiction is appropriate:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable.

*LNS Enters. LLC v. Cont'l Motors*, 22 F.4th 852, 859 (9th Cir. 2022) (citation omitted).

While cases arising out of contract claims typically use the "purposeful availment" test and cases arising in tort typically use the "purposeful direction" test, *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1090–91 (9th Cir. 2023), generally the first prong

can be satisfied by either purposeful availment, purposeful direction, or a combination of the two. *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023), cert. denied, 144 S. Ct. 826 (2024). Here, in an action for misappropriation of trade secrets, purposeful direction is the most applicable test. *See CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066 (9th Cir. 2011); *Nat'l Specialty Pharmacy, LLC v. Padhye*, 734 F. Supp. 3d 922 (N.D. Cal. 2024)); *Regal W. Corp. v. Nguyen*, 412 F. Supp. 3d 1305 (W.D. Wash. 2019)

Under the *Calder* "effects" test, (*Calder v. Jones*, 465 U.S. 783 (1984)), the requirement that a defendant's conduct be expressly aimed at the forum state "encompasses wrongful conduct targeting a known forum resident." *Bancroft & Masters, Inc. v. Augusta Nat'l. Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000), holding modified by *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006). Nonetheless, personal jurisdiction must still be based on a defendant's own affiliation with the forum state, not simply a connection to an Arizona resident. *See Walden v. Fiore*, 571 U.S. 277, 285 (2014).

"The party seeking to invoke the jurisdiction of the federal court has the burden of establishing that jurisdiction exists." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff cannot "simply rest on the bare allegations of the complaint, but rather [is] obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction." *Amba Mktg. Sys. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977).

### III. Defendant Brandon Williams' Motion to Dismiss for Lack of Jurisdiction (Doc. 48)

Defendant Brandon Williams filed a Motion to Dismiss for Lack of Personal Jurisdiction. No facts exist to support the existence of general jurisdiction, so only a specific jurisdiction analysis is applicable. The issues here are focused on the first prong of the three-part analysis.

In its Response, Plaintiff claims that "Williams satisfies the first prong of the

purposeful direction [test] because misappropriation is an intentional act." (Doc. 67 at 8).[5] However, Plaintiff has alleged only that Williams knew about misrepresentations by others in the License Agreement negotiations, knew the Licensed Source Code would be disclosed to FTX under the Third SPA, knew that disclosure of the Licensed Source Code was impermissible, and entered the Third SPA with the purpose of giving FTX access to the Source Code. None of these allegations establish the necessary contacts with Arizona. Although it is noteworthy that Williams is one of only three incorporators and shareholders of DAAG, Modulus has set forth no facts indicating his involvement in securing the Licensing Agreements and he denies all involvement. The allegations regarding Williams' state of mind are merely conclusory without supporting facts.

Plaintiff's remaining arguments relating to purposeful direction or availment are summarized as follows: (1) DAAG's contacts with Arizona can be imputed to Williams (Doc. 67 at 6); (2) the License Agreements between DAAG and Modulus create sufficient minimum contacts for the exercise of jurisdiction by creating a "long-term contractual relationship that envisioned substantial connections with Arizona under Arizona law to be resolved, in the event of a dispute, in Arizona" (*Id.* at 4); and (3) Williams' representations in the Share Purchase Agreements with FTX Trading amount to purposeful direction because they were contrary to DAAG's obligations under the License Agreements. (*Id.* at 6–7). These arguments, too, fail to establish the Court's jurisdiction over Williams.

An officer's or employee's mere association with a corporation is an insufficient basis for the Court to assert jurisdiction over the employee, even if the Court can assert jurisdiction over the corporation. *See Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1109 (9th Cir. 2020) ("We do not impute a corporation's forum contacts to each of the corporation's employees. Instead, we assess whether each individual had minimum contacts with the forum such that the exercise of jurisdiction over that individual would comport with traditional notions of fair play and

---

[5] Plaintiff cites *LifeSuccess Productions LLC v.* Martinelli in support of this contention, where a Defendant was "alleged to have committed the intentional act of misappropriating trade secrets." But Plaintiff has not set forth facts asserting Williams' commission of any act of misappropriation.

substantial justice.").

Plaintiff argues that "liability attaches to officers and directors of a corporation in their personal capacity when they 'have knowledge amounting to acquiescence…of the corporate affairs causing or contributing to the injury.'" (Doc. 67 at 7). This argument fails on two fronts: first, potential liability does not equate to personal jurisdiction. Second, even if such knowledge of the acts of others were sufficient to establish the requisite contacts, Plaintiff has not sufficiently supported this claim with requisite facts. It is noteworthy that Williams is one of only three co-founders and shareholders of DAAG and served as Corporate Development Lead.[6] Plaintiff states in its Response that "the Motion [to Dismiss] relies on Williams' declaration as to his non-involvement with Modulus…But non-involvement does not preclude acquiescence—or willful blindness." (Doc. 67 at 7). However, the Court cannot exercise personal jurisdiction based on a speculation of willful blindness; there must be facts. In the face of a motion to dismiss for lack of personal jurisdiction, Plaintiff cannot "simply rest on the bare allegations of the complaint, but rather [is] obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction." *Amba Mktg. Sys. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir.1977). In the absence of support for Plaintiff's allegations, the Court cannot presume Williams had "knowledge amounting to acquiescence."

Plaintiff's arguments regarding the License Agreements (Source Code) between DAAG and Modulus and the SPAs between DAAG and FTX similarly fail to establish jurisdiction over Williams. Williams is not alleged to have solicited, negotiated, signed, nor was he named in the License Agreements with Modulus. (Doc. 69). Plaintiff alleges the Court find that Williams was aware of misrepresentations in those negotiations; that Williams entered into the third Share Purchase Agreement with FTX knowing that it was inconsistent with DAAG's obligations to Modulus; that he entered that agreement for the purpose of allowing FTX to acquire Modulus' Source Code; and, generally, that he "either supplied to FTX or had reason to know that DAAG would improperly supply to FTX"

---

[6] This title is undefined in the First Amended Complaint. (Doc. 39).

Modulus' trade secrets. (Doc. 39 at 134). But Plaintiff has not set forth requisite facts supporting this conclusion, nor has it explained how the acts create minimum contacts with Arizona. (*See* Doc. 69). *See Amba Mktg. Sys.* 551 F.2d at 787.

Because Plaintiff has failed to establish Williams' significant and necessary ties to Arizona for personal jurisdiction, the Motion to Dismiss (Doc. 48) will be granted. Plaintiff requests leave to conduct further jurisdictional discovery, but what Plaintiff has proffered is insufficient to show that further jurisdictional discovery would be profitable in establishing personal jurisdiction.

**IV. Defendant Patrick Gruhn's Motion to Dismiss for Lack of Jurisdiction (Doc. 51)**

Gruhn is a resident of Oregon, owns no property in Arizona, and has never lived in or visited Arizona. (Doc. 51-1 at 1–6). Modulus asserts claims against Gruhn for misappropriation of trade secrets under federal and Arizona law, civil conspiracy to commit theft of trade secrets, and fraud. Gruhn's challenge to personal jurisdiction is largely theoretical, without directly contesting the factual allegations. He nevertheless denies those alleged contacts support the exercise of personal jurisdiction. Consequently, the operative question is whether the conduct alleged by Plaintiff constitutes purposeful direction at the state of Arizona.

Gruhn argues personal jurisdiction is inappropriate because under *Walden v. Fiore*, knowledge that the plaintiff resides in the forum is insufficient to establish jurisdiction because "plaintiff cannot be the only link between the defendant and the forum." 571 U.S. 277, 285 (2014). Although "a defendant's relationship with a plaintiff or third party *standing alone*, is an insufficient basis for jurisdiction," *Walden*, 571 U.S. at 285 (2014) (emphasis added), Gruhn's relationship to Modulus does not stand alone.

Unlike Williams, Gruhn's part includes several affirmative acts directed toward Arizona. Gruhn reached out to Plaintiff in Arizona when he submitted the initial online contact form to Modulus expressing interest in the Source Code. (Doc. 39 ¶¶ 78–79). He subsequently negotiated the License Agreements for the Source Code, was listed in the contract as the contact person for DAAG (Doc. 39 ¶ 85; Doc 44 at 1), and later signed an

addendum adding another product to the License Agreements (Doc. 66-2). Throughout the negotiations, Gruhn concealed material facts about DAAG's relationship with FTX. (Doc. 39 ¶¶ 106–08). After execution of the License Agreements, Gruhn engaged in carrying out the agreements and implementing the technology, including engaging in substantial email and Slack[7] communications with Modulus for guidance in deploying the software. (Doc. 66-3). Following the acquisition of DAAG by FTX, Gruhn participated in the disclosure of the Modulus Source Code to FTX and to other defendant entities. (Doc. 39 ¶¶ 134, 189, 193–207, 218).

These acts and conduct created contacts with Arizona that are by no means "random, fortuitous, or attenuated," nor the result of the "unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). In *Walden*, the fact of the plaintiff's residence in the forum state was entirely random and unconnected to the complained of conduct. *Walden*, 571 U.S. 277 (2014). There, the defendant encountered plaintiffs outside of the forum state and did nothing to the plaintiffs while they were in the forum state; he "never…contacted anyone in, or sent anything…to [the forum state]." *Id*. at 289. Gruhn, on the other hand, initiated contact with Modulus where it resided in Arizona, requesting further contact, and engaged in significant communication with Modulus in Arizona (Doc 66 at 6).[8]

Defendant further cites to Washington case *HDT Bio Corp. v. Emcure Pharms, Ltd.*, in which the district court found "[the defendant's] alleged theft of trade secrets [did] not

---

[7] Slack is a messaging platform often used for workplace communication. *See* Steven John, *'What is Slack?' Everything You Need to Know About the Professional Messaging Program*, BUSINESS INSIDER (Feb. 18, 2021), https://www.businessinsider.com/guides/tech/what-is-slack

[8] The Court has taken account of *Applied Underwriters, Inc. v. Combined Mgmt., Inc.,* 371 Fed. Appx. 834 (9th Cir. 2010) and *In re Boon Global Ltd.*, 923 F.3d 643 (9th Cir. 2019). *Applied* held "ordinarily 'use of the mails, telephone, or other international communication simply do not qualify as" purposeful availment or direction, and in *Boon*, there was no jurisdiction over a defendant who merely signed an agreement in his capacity as C.E.O. Here, Gruhn is alleged to have done more and interacted more directly than the defendants in *Applied* and *Boon*.

establish a meaningful connection to the United States." 704 F.Supp.3d 1175, 1191. However, Gruhn's alleged misappropriation of trade secrets does not stand alone.

Although this case is brought in tort, not contract, the License Agreements (Source Code) underly Plaintiff's claims, and the "negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" are relevant to determining whether Gruhn "purposefully established minimum contacts within [Arizona]." *Burger King Corp.*, 471 U.S. at 479. Gruhn argues that he was not a party to the contracts between Modulus and DAAG. However, he was a co-founder (Doc. 51 at 14), shareholder (Doc. 39 ¶ 56), and Global IT Director (Doc. 39 ¶ 56) of DAAG and engaged in significant affirmative conduct regarding the contracts by conducting the negotiations, carrying out the contracts, and signing the subsequent addendum. (Doc. 66-2). Although Gruhn acted in his representative capacity for DAAG, "the corporate form may be ignored…where there is an identity of interests between the corporation and the individuals," and "under Arizona law, fraud has provided the basis for asserting jurisdiction in spite of the corporate shield." *Davis v. Metro Productions, Inc.*, 885 F.2d 515, 520-21 (9th Cir. 1989). Modulus has pled facts indicating that DAAG was used by its officers and shareholders for their personal benefit and to carry out the fraudulent misappropriation of Modulus' Source Code. Thus, it is appropriate to consider Gruhn's actions even though they were taken on behalf of DAAG.

While the relationship created between Modulus, DAAG, and its officers by the License Agreements (Source Code) was much less than the franchise relationship in *Burger King Corp.*, the terms of the License nonetheless "reinforce" Gruhn's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Id.* at 482. The License Agreements (Source Code), as negotiated by Gruhn, were comprehensive in that they contained an Arizona choice of law provision, a provision for Arizona-based arbitration, a requirement to report security breaches, a requirement to obtain Modulus' written permission prior to transferring the Source Code to any third party in the event of an acquisition, and provision for a year of complementary updates and tech support from

Modulus. (Docs. 44, 44-1).

Throughout the negotiations, Modulus asserts that Gruhn made material omissions amounting to fraud by deliberately concealing the close relationship between DAAG and FTX. (Doc. 39 ¶ 270). By these omissions, Gruhn sufficiently engaged in contacts with Modulus to establish jurisdiction in Arizona.

That is, Gruhn deliberately reached out to and initiated contact with Modulus, made material and fraudulent omissions, communicated extensively with Modulus in Arizona, and negotiated a contract under Arizona law. The Court finds his conduct was expressly aimed at Arizona sufficient to support the exercise of jurisdiction such that the Motion to Dismiss will be denied.

### V. Defendant Stephen Stephens' Motion to Dismiss for Lack of Jurisdiction (Doc. 54)

Defendant Stephen Stephens' Motion to Dismiss for Lack of Personal Jurisdiction is also before the Court. (Doc. 54). The allegations against Stephens roughly mirror the allegations against Gruhn, except that Stephens is not alleged to have personally reached out to Modulus to initiate contact.

Though he was not a founder and shareholder of DAAG like Gruhn, Stephens is alleged to have deliberately targeted Modulus in a conspiracy to fraudulently obtain its trade secrets. (Doc. 39 ¶¶ 260–63, 266, 272–75). Like Gruhn, Stephens was an integral part of the license negotiations and software implementation. (Doc. 39 ¶ 24). Although Stephens did not personally submit the online form that initiated contact with Modulus, Modulus has alleged sufficient facts that are more than suggestive of joint action in its claims for conspiracy and fraud, including the fact that Stephens learned of and participated in a sales call regarding Modulus' software in 2018.

Thus, like Gruhn, Stephens has purposefully directed his activities toward Arizona and the Motion to Dismiss will be denied.

### VI. Defendant DAAG USA LLC's Motion to Dismiss for Lack of Jurisdiction (Doc. 52)

Defendant DAAG USA, LLC also filed a Motion to Dismiss for Lack of Personal Jurisdiction. Modulus' complaint contains five specific allegations regarding DAAG USA:

(1) Modulus' Source Code has been disclosed to DAAG USA, (Doc. 39 ¶ 20); (2) Williams is an owner of DAAG USA, (Doc. 39 ¶ 25); (3) DAAG USA is located in Oregon, (Doc. 39 ¶ 221); (4) DAAG USA improperly acquired the Modulus Source Code, (Doc 39 ¶¶ 232, 252); and (5) DAAG USA knew or had reason to know that DAAG's knowledge of the Source Code under the License Agreements (Source Code) was improperly acquired. *Id.*

The three individual and three entity defendants are closely tied together. Gruhn is or was an owner or shareholder of DAAG and all three corporate defendants. DAAG USA was formed in April 2021, (Doc. 51 at 15) which is nine months after DAAG's incorporation and four months prior to Gruhn's initial contact with Modulus. In the time since it was formed, Gruhn states, DAAG USA has had no operations. *Id.* These factual circumstances support the inference that DAAG USA was likely used as an instrumentality in the course of the alleged misappropriation, but Modulus has not presented requisite facts establishing minimum contacts with Arizona.

Modulus argues (1) misappropriation of trade secrets is an intentional act—the first prong of the purposeful direction inquiry; and (2) DAAG USA, through Gruhn, knew that the harm caused by its actions would be felt in Arizona—the third prong. To establish the "express aiming" prong, Modulus relies on facts not pled in the First Amended Complaint. As such, it has not yet carried its burden of proving personal jurisdiction over DAAG USA and the Motion to Dismiss will be granted, with leave to amend.

**VII. Defendant Kephas Corporation's Motion to Dismiss for Lack of Jurisdiction (Doc. 53)**

Defendant Kephas Corporation's Motion to Dismiss for Lack of Personal Jurisdiction is next before the Court. Modulus argues that Kephas is subject to personal jurisdiction by consent and under the purposeful direction test. (Doc. 66 at 11-13).

Kephas uses an Arizona-based private registration service called Domains by Proxy to maintain its website. (cite). Part of the Domains by Proxy Agreement (the "DBP Agreement") includes a representation that the client will use the service "in good faith"

and that the domain name will "not be used in connection with any illegal activity." (Doc. 66 at 11). Modulus then asserts that by marketing goods alleged to incorporate misappropriated Trade Secrets on its website, this warranty is breached. *Id.* Another provision states that any actions related to the DBP Agreement are to be brought in Maricopa Couty. *Id.* at 12. Because "Modulus' claims…are closely related to Kephas' representations and warranties in the DPB agreement," Modulus contends that the contract with Domains by Proxy amounts to consent to Arizona's personal jurisdiction.

This argument is unavailing. Modulus is not a party to the contract between Kephas and Domains by Proxy and Kephas' relationship with Modulus is not governed by that contract. In *Wallach v. Johnson*, this Court declined to exercise jurisdiction where the defendants published defamatory statements about the plaintiffs on a website using Domains by Proxy. 2019 WL 4977474. The Court said the plaintiffs were "attempting to piggyback off of the forum selection clause contained in the contracts between [the defendant] and GoDaddy and Domains by Proxy." *Id.* at *3. The Court found "no logical or causal connection" between the defamation suit and the contracts. Here, as well, there is "no logical or causal connection" between Kephas' contract with Domains by Proxy and Modulus' suit.

Next, Modulus asserts that Kephas satisfies the purposeful direction test. (Doc. 66 at 12). The first prong, commission of an intentional act, is satisfied by the alleged misappropriation of trade secrets. The third prong, harm the Defendant knows is likely to be suffered in the forum state, is likely met as well. However, Modulus' contention that the second prong, express aiming, is met falls short. Modulus argues Gruhn and Stephens' contacts with Arizona can be imputed to Kephas through reverse piercing of the corporate veil because they are each an owner or officer of Kephas, and their contacts were intended to benefit Kephas (*Id.* at 13). However, intent to benefit is not a basis for imputation of forum state contacts. In the same way that "we do not impute a corporation's forum contacts to each of the corporation's employees," we do not simply impute an officer or director's contacts to the corporation. Kephas was not a party to the License Agreements

(Source Code), and there is no evidence that Stephens or Gruhn were acting in their capacity as representatives of Kephas.

Modulus argues that reverse piercing of the corporate veil is applicable where an owner or principal "has used multiple entities to hide assets or secretly to conduct business to avoid liability" If Modulus is asserting an alter ego theory, it has failed to allege facts evidencing "such unity of interest and ownership that the separate personalities of [Kephas] and [Gruhn and Stephens] cease to exist. *Dietel v. Day*, 492 P.2d 455, 457 (Ariz. Ct. App. 1972). Because Modulus has not shown sufficient minimum contacts between Kephas and Arizona to satisfy the requirements of Due Process, the Motion to Dismiss will be granted.

### VIII. Defendant WIB Technologies Inc.'s Motion to Dismiss for Lack of Jurisdiction (Doc. 55)

Modulus alleges that WIB Technologies, Inc. received and used Modulus' Source Code knowing that such access and use was improper. Like its arguments regarding Kephas, Modulus asserts that Gruhn and Stephens' contacts with Arizona are attributable to WIB because "WIB's eventual access to the Modulus [Source Code] was a driving force of Stephens' Arizona contacts." (Doc. 66 at 14).

Stephens and Gruhn, however, were not acting in a representative capacity for WIB. Modulus makes a case that to divorce WIB from Gruhn and Stephens "would be to work an injustice." (Doc. 66 at 14). As in the case of Kephas, without facts establishing "that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist," *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (citation modified), Modulus cannot justify disregarding the corporate form and imputing Gruhn and Stephens' contacts to WIB for jurisdictional purposes. An individual's intent to benefit a third party does not automatically confer personal jurisdiction over the third party.

Because Modulus has not set forth facts showing that WIB established minimum contacts with Arizona, the Motion to Dismiss will be granted.

Accordingly,

**IT IS ORDERED** Defendant Brandon Williams' Motion to Dismiss for Lack of

Personal Jurisdiction (Doc. 48) is **GRANTED**. Plaintiff's claims against Defendant Williams are **DISMISSED**.

**IT IS FURTHER ORDERED** Defendant Patrick Gruhn's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 51) is **DENIED**.

**IT IS FURTHER ORDERED** Defendant Stephen Stephens' Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 54) is **DENIED**.

**IT IS FURTHER ORDERED** Defendant DAAG USA, LLC's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 52) is **GRANTED.** Plaintiff's claims against Defendant DAAG USA, LLC are **DISMISSED WITH LEAVE TO AMEND**.

**IT IS FURTHER ORDERED** Defendant Kephas Corporation's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 53) is **GRANTED**. Plaintiff's claims against Defendant Kephas Corporation are **DISMISSED**.

**IT IS FURTHER ORDERED** Defendant WIB Technologies Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 55) is **GRANTED**. Plaintiff's claims against Defendant WIB Technologies Inc. are **DISMISSED**.

Dated this 13th day of February, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge